ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

MARK J. WENKER
Assistant U.S. Attorney
Arizona State Bar No. 018187
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-4408
Telephone: (602) 514-7500
mark.wenker@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>             Plaintiff,<br><br>     v.<br><br>$50,200.00 in United States Currency,<br><br>             Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

## **NATURE OF THE ACTION**

1. This is a civil action *in rem* to forfeit property to the United States pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.,* or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

2. This is a civil action *in rem* to forfeit property to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) because it is property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 and because it

constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including 18 U.S.C. § 1952 and 21 U.S.C. § 841.

3. This Court has jurisdiction because the United States commenced this action and because it seeks forfeiture. 28 U.S.C. §§ 1345, 1355. Venue is proper in this District because acts or omissions giving rise to forfeiture occurred in this District and because the defendant property is located in this District. 28 U.S.C. §§ 1355(b), 1395(b).

## THE DEFENDANT IN REM

4. The defendant consists of $50,200.00 in United States currency (the "Defendant Property") seized by the Drug Enforcement Administration ("DEA") on May 26, 2017.

## FACTS

*Seizure of $50,200.00 in United States Currency*

5. On May 26, 2017, law enforcement in Pittsburgh, Pennsylvania, notified DEA agents and task force officers ("Investigators") in Phoenix, Arizona, that a passenger by the name of Miguel Flores ("Flores") was traveling aboard American Airlines Flight 528 from Pittsburgh to Phoenix Sky Harbor International Airport with $50,000.00. According to the tip, Flores admitted to Transportation Security Administration workers in Pittsburgh that he had a total of $50,000.00 cash in a black carry-on bag in the pockets of two pairs of pants, as well as some money on his person.

6. Pittsburgh law enforcement further advised that $34,110.00 of suspected drug proceeds had been seized from Flores at Phoenix Sky Harbor International Airport on October 7, 2014.

7. Based upon their training and experience, Investigators knew that it is common for drug dealers to transport large amounts of currency from drug demand areas (such as Pennsylvania) to drug source areas (such as Arizona).

8. A records search also revealed that Flores had a criminal history that included arrests for possession of marijuana, drug paraphernalia, theft, and assault. Based

2

upon their training and experience, Investigators knew that drug and/or drug currency couriers often have criminal pasts.

9. Based on this information, Investigators decided to contact Flores upon his arrival in Phoenix.

10. At approximately 7:00 p.m., Investigators responded to Terminal 4, Gate A2, and observed a man (later confirmed to be Flores) exit the above-mentioned flight. Investigators initiated a consensual conversation with Flores. Flores advised that he had $50,000.00 in his carry-on bag.

11. According to Flores, the money was given to him by his mother and he was going to use it to purchase a car for his father. He would drive the newly-purchased vehicle to Las Vegas, Nevada, from Arizona, and then decide whether or not he would drive the car to Ohio or transport it back there some other way.

12. When asked, Flores stated that the vehicle he intended to buy was a 2010 GMC Sierra Denali truck for $42,000.00. One of the Investigators said that $42,000.00 was a rather high price for such an old vehicle, but Flores said that even though it was "pricey," that is what they were selling for at this time. Flores said he had spoken to the seller earlier in the day, and that he could later provide the Investigators with the seller's contact information. Flores said the Investigators could then call the seller and confirm Flores' account.

13. Flores said that he did not have his mother's phone number.

14. Flores said he had never been contacted by law enforcement at the airport in the past regarding the transportation of large sums of currency (which the Investigators knew to be untrue based upon the October 7, 2014 seizure of $34,110.00).

15. Flores also said he had never been arrested (which Investigators also knew to be untrue).

16. Flores then voluntarily agreed to leave the public area of the terminal and go to Commercial Narcotics Interdiction Unit ("CNIU") office to discuss the currency in more detail.

17. While walking to the office, Flores stated that he had worked as a parts manager in the past, but that he was currently unemployed. Flores said he never had any other type of work. Flores also told the Investigators that the currency would be in his carry-on bag, in the pockets of two pairs of pants.

18. Investigators were aware that in the 2014 seizure Flores also concealed currency in pants pockets inside his luggage. In the 2014 incident, however, Flores had said that he made a living selling cars as well as selling parts.

19. When Flores was asked what the denominations of the currency would be, he nervously replied they were primarily $20 bills, though about $5,000.00 was in $50 bills as well.

20. Investigators knew that $20 bills are the most common denomination used in street-level drug transactions. They presumed that Flores reacted nervously because he knew this as well.

21. Flores then said he was not sure about the denominations of the money and that his mother had just handed him the cash today in a bank bag. He said his mother would verify his story regarding his receipt of the currency from her.

22. Flores said he had removed the money from the bank bag and put it in the pants pockets, and then put the pants in his carry-on bag. He said he did it this way so the money would not all be in one place.

23. Flores said neither he nor the currency had been around any illegal drugs.

24. The Investigators took photos of the currency found in the pants pockets. Investigators noted that one of the pairs of pants seemed much larger than anything that would fit Flores. Flores said the larger pants belonged to his father.

25. Flores was carrying 17 $100 bills and 20 $10 bills on his person, as well as a driver's license in the name of Crystal Ramirez ("Ramirez"). Flores said the money found on his person was spending money and that he keeps his girlfriend's driver's license because she always loses things.

4

26. Flores said that his parents still owned the Arizona residence listed on his Arizona driver's license, and that he stayed in that house whenever he visited his children in Arizona. He said his children were five and seven years old. The majority of the time, however, he said he lived with his parents at their residence located at 7396 Tiffany South, Youngstown, Ohio. He said his parents had just moved there five or six months earlier.

27. Flores said that his mother's name was Lucia Flores and that his father's name was Victor Flores.

28. When asked whether or not Flores was required to pay child support, Flores said he was supposed to pay $900.00 per month, but that he was unable to do so since he was unemployed.

29. When Investigators requested that Flores contact his mother so she could confirm his story, Flores said he had just gotten a new phone and that his mother's number was not in it.

30. Flores stated that he had bought the $485.00 one-way ticket today and paid for it on Ramirez' credit card.

31. Investigators thought it was odd that Ramirez was paying for the flight instead of Flores' father, since the primary purpose of Flores' travel was to buy a vehicle for his father.

32. Also, based on training and experience, Investigators knew that it was common for passengers carrying drugs and/or drug proceeds to buy one-way tickets utilizing third-party credit cards in the names of others just a day or two before travel, to conceal their identities and minimize their exposure to commercial airlines and law enforcement.

33. When questioned about the potential truck purchase, Flores claimed he had spoken to the seller on the phone about the vehicle before coming to look at it. He further claimed he and the seller had exchanged text messages, too. However, when asked again what year the GMC Denali was, Flores seemed confused, stating it was a 2010, and then a 2016, and finally said, "I don't know."

34. The Investigators then watched as Flores looked at his phone and appeared to be pretending to scroll through text messages. Investigators believed Flores' actions were a farce, and asked him if they could see his phone and read his text messages. Flores refused.

35. Flores could not provide any specific information regarding the vehicle purchase or the name and contact information of the seller (such as a phone number, website, or e-mail address).

36. At this point the conversation between Flores and the Investigators became somewhat contentious as the Investigators told Flores that they thought he was lying about his criminal history as well as a previous money seizure. The Investigators then told Flores about his previous arrest record and the $34,110.00 seizure in 2014.

37. Flores' body language and facial expression changed immediately and he appeared very nervous when the 2014 seizure was mentioned.

38. Flores then became defensive and told the Investigators that he had a previous head injury involving a coma and that he did not remember the specifics of the 2014 incident. Additionally, he avoided talking about his earlier arrests, other than to state that they were not serious offenses and that they had happened when he was much younger. Flores further said he did not recall ever receiving any correspondence from the government regarding the $34,110.00 seized.

39. Investigators asked Flores how he would inform his mother about how he would transport the newly purchased vehicle to Ohio when he arrived in Las Vegas if he did not have her phone number. Flores did not give a response.

40. Strangely, however, Flores said that he did not have his father's phone number either, but then changed his story and stated that he did have it, but would not give it to the Investigators.

41. Flores then received an incoming call from Ramirez on his phone that went unanswered. An Investigator, however, called Ramirez back and asked her questions about Flores.

6

42. Ramirez confirmed that Flores was her boyfriend, but appeared hesitant and afraid to talk to the Investigator. Ramirez said she did not get involved in Flores' business and that he did not tell her anything. She said Flores was there for the long holiday weekend and that he intended to visit their kids. She said Flores would stay at her home, but that they did not have any plans to go anywhere.

43. Flores also had a second phone, but he would not allow Investigators to look into this second phone either, so both his phones were seized and impounded as evidence.

44. Drug dealers commonly have multiple telephones to avoid detection by law enforcement and to assist in the trafficking of drugs and drug proceeds.

45. Flores was advised that the currency on his person and in the carry-on was being seized as the proceeds of drug trafficking. After an official count the Defendant Property was found to be $50,200.00 in United States currency. The Defendant Property was made up of 100 $100 bills, 200 $50 bills, 1,500 $20 bills, and 10 $10 bills.

46. When advised that the currency, both on his person as well as in his luggage, would be subjected to an examination by a trained narcotics canine, Flores appeared to be more concerned about the smaller amount being retrieved from his person, than the larger amount found in his carry-on bag.

47. Investigators believed this was because the currency on Flores' person was likely his payment for transporting drug proceeds, while the currency in the carry-on was to be used solely for the purchase of drugs.

***Positive Alert to $50,200.00 in U.S. Currency by Certified Narcotics Detection Canine***

48. On May 26, 2017, Phoenix Police Department Detective Michael Oolman and his certified narcotics detection canine, Zadie, were asked to assist with the investigation of the Defendant Property.

49. Zadie is a three-year old Labrador/Pointer mix. She is trained and certified to detect the odors of marijuana, cocaine, heroin, and methamphetamine, and their

7

derivatives. Zadie is currently certified with the National Police Canine Association, and was last certified on January 2017.

50. Zadie does not alert to the odor of currency unless that currency has been in recent close proximity to a substance Zadie is trained to detect and, therefore, Zadie is a "sophisticated drug dog" and a positive alert is "strong evidence" of a connection to drug trafficking. See United States v. $132,245.00 in U.S. Currency, 764 F.3d 1055, 1058-59 (9th Cir. 2014).

51. If at any time during a search Zadie smells one of the four odors she is trained to detect, or their derivatives, her behavior changes as she becomes excited, wags her tail, scratches at the item with the odor in and/or on it, and sits down. Detective Oolman is Zadie's only handler.

52. An area was set up in CNIU's office located in Terminal 4 to conduct the drug examination by Zadie. The office area included numerous desks, file cabinets, and other miscellaneous items. Zadie was brought into the office and given the command to sniff the area. All items were sniffed and there were no alerts during the clearing. Zadie was placed into her kennel in a separate area.

53. The Defendant Property was then put inside a drawer in the previously cleared area. Zadie was brought back into the cleared area and given the command by Detective Oolman to search. At 7:41 p.m. Zadie's behavior changed as she became excited, wagged her tail, scratched, and sat down near the drawer with the Defendant Property in it. Detective Oolman recognized Zadie's change in behavior as a positive alert, meaning Zadie smelled one of the odors she was trained to detect.

*Earlier Airport Seizure of $34,110.00 from Flores - October 7, 2014*

54. On October 7, 2014, law enforcement in Phoenix received a tip that Flores had purchased a one-way ticket from Pittsburgh to Phoenix Sky Harbor International Airport within the past 24 hours.

55. A records check revealed Flores had numerous juvenile and adult arrests in Arizona.

8

56. Contact was made with Flores when he arrived at Phoenix Sky Harbor International Airport, Terminal 2, from Pittsburgh.

57. Flores claimed he had neither drugs nor currency in his possession.

58. Flores consented to a search of his two bags. During the search law enforcement found several bundles of currency inside a packed pair of pants in the pockets.

59. Flores agreed to accompany law enforcement to its office to discuss the currency. Flores said the source of the currency was his savings, sales from his business (Flores Auto Sales), income from a separate job working at an auto parts warehouse, and his father's Social Security benefits.

60. Flores, however, said he had not been able to work in several months because he had a brain surgery about six months earlier. He said he had injured his head in an ATV accident. This statement is inconsistent with Flores' statements during the May 26, 2017 seizure when he inferred that he suffered a brain injury after the October 2014 seizure, which is supposedly why he could not remember the $34,110.00 being seized.

61. Flores initially said the currency totaled $9,000.00, but later said it was a little more than $30,000.00. A count of the funds revealed it was $34,110.00 in United States currency.

62. Flores said he had withdrawn $27,000.00 from his business account about a month ago, and that the bulk of the $34,110.00 came from that withdrawal.

63. Flores gave conflicting stories regarding why he was carrying the $34,110.00 in cash. Initially he said he had flown to Pittsburgh to visit his daughter in the hospital in Pennsylvania. He said the money was to be used to pay her medical bills, but his daughter's mother had a restraining order against him, and the hospital would not let him on the premises. Thus, he flew back to Phoenix with the money. Later, however, he said part of the money was for medical bills and the rest was to help pay for his move to Pittsburgh so he could be closer to his daughter in Pennsylvania.

9

64. Flores could not remember the name of the facility where his daughter was hospitalized.

65. The $34,110.00 was seized as the proceeds of drugs trafficking.

66. A certified narcotics canine alerted to the $34,110.00.

67. A financial background check revealed no business by the name of Flores Auto Sales registered with the Arizona Corporation Commission nor banking activity by a company of that name.

68. The $34,110.00 was administratively forfeited by the DEA on February 11, 2015.

*Later Airport Money Seizure of $50,000.00 (from Ramirez) – October 17, 2017*

69. On October 17, 2017, just five months after the Defendant Property was seized from Flores, Investigators received a tip that Flores' girlfriend, Ramirez, was traveling with Flores from Charlotte, North Carolina, to Phoenix Sky Harbor International Airport on one-way tickets purchased by Flores within the past 24 hours of travel. Flores and Ramirez were assigned seats next to each other.

70. Investigators were aware that Flores had two previous airport cash seizures and a criminal background involving drug-related arrests.

71. Investigators in Phoenix attempted to make contact with both Flores and Ramirez as they each exited the airplane at Phoenix Sky Harbor International Airport and approached the baggage return area. Ramirez exited first, and went directly to the baggage return area. Flores exited a few minutes later. Flores appeared to have recognized one of the Investigators from the earlier May 26, 2017 seizure, and upon doing so, abruptly headed into a nearby elevator away from the baggage claim area. Investigators were unable to find Flores.

72. Ramirez retrieved her luggage from baggage claim and was approached by Investigators.

73. Ramirez claimed to be flying home alone after a trip to North Carolina for fun. She said she had been there for the weekend.

10

74. Ramirez stated that she had booked her travel, even though Investigators knew Flores had.

75. Ramirez claimed she was not traveling with drugs or a large amount of currency and consented to a search of her bag. A bundle of currency was found in the pockets of a pair of pants in her bag.

76. When confronted with the facts that Flores had indeed reserved the flight and traveled with her, and that they had found currency in her bag, she shrugged her shoulders.

77. She said that money amounted to about $20,000.00.

78. Ramirez said she had earned the money as a stripper during her trip. After several variations of her story regarding the source of the money (meeting people at golf tournaments and going to Pittsburgh to do some sort of job), she eventually claimed it was all made at one party as a stripper.

79. Ramirez claimed that she paid taxes on $43,000.00 in income in 2016, but then said she could not remember where she had worked. When challenged about the absurdity of not recalling her employment from the previous year, she told Investigators she had worked as a waitress and at a call center for Charles Schwab through a temp agency.

80. Ramirez continued to laugh at different times throughout the interview as if the situation was a joke.

81. When asked why she did not wait for Flores when he got off the plane, she said she was "done with him and this whole thing" and that he was "a liar."

82. Investigators believed the "whole thing" Ramirez was referring to was Flores' drug-related smuggling of currency.

83. The currency was seized and found to be $50,000.00.

84. A trained and certified narcotics canine alerted to the currency.

85. When informed, Ramirez did not seem concerned that the $50,000.00 was being seized by law enforcement.

86. The Maricopa County Attorney's Office is currently in the process of forfeiting the $50,000.00 as the proceeds of drug trafficking.

*Criminal Histories*

87. Flores was arrested for Theft (2009), Marijuana Use and Drug Paraphernalia Possession/Use (2012), Driving with a Suspended/Revoked/Cancelled License (August 2014), Criminal Damage (November 2014), Failure to Appear (2015), Assault – Intent/Reckless/Injure Victim Domestic Violence (2016), Aggravated Assault (June 2017), and First Degree Murder (November 2017).

88. Ramirez was arrested on July 4, 2014 for Exceeding 85 Miles Per Hour and on July 16, 2014 for Driving with a Revoked/Suspended/Cancelled License.

*Financial Histories*

89. According to records from the Arizona Department of Economic Security ("DES"), neither Flores nor Ramirez has reported any income since the first quarter of 2016.

90. According to federal tax returns, Flores earned $32,903.00 in 2013 and $6,607.00 in 2014. Flores' attorney said the reason Flores' 2014 income was so small was because Flores had a brain injury part way through that year and was not able to work the remainder of 2014.

91. Flores also told his attorney that, other than the period of his recovery from his brain injury, he had worked "his entire life" and had filed tax returns since 2014 as well. However, Flores was unable to provide any additional tax returns to the government before the filing of this complaint.

92. Flores alleged that he had significant income from 2015 to 2017 is contradicted by information provided from DES (showing he had not had any income since the first quarter of 2016) as well as Flores himself (who told Investigators on May 26, 2017 that he was unemployed).

12

*Administrative Claim*

93. On October 11, 2017, the DEA received a valid administrative claim to the Defendant Property from Flores.

94. In the claim Flores asserted that he was the owner of the property.

95. Flores also alleged that the Defendant Property came from a portion of the Social Security death benefits Flores received when his father, Victor Manuel Flores ("Victor Flores"), died on July 7, 1995.

96. Flores said he received these benefits from 1995 (when he was four-years old) until 2009 (when he turned 18).

97. Flores said that because he was a minor, his mother, Lucia Vasquez Flores ("Lucia Flores") received the benefits on his behalf.

98. Flores said that for 15 years (1995 to 2009) his mother cashed these Social Security benefits, put the cash into a safe, and never spent any of it. He said that by 2009 the money in the safe from the Social Security benefits totaled $75,010.00.

99. Flores claimed that when he turned 18, in 2009, he asked his mother to continue to keep the $75,010.00 in the safe for him because he did not need it at that time.

100. According to Flores, about two months before the $50,200.00 was seized, he asked his mother to give him $60,000.00 from the safe. He said he intended to use the money to "buy property or a classic car as an investment" (which contradicted what he told Investigators at the time of the seizure about purchasing a car for his father).

101. Flores claimed that the "money is not the proceeds of anything illegal."

102. Flores provided records detailing the Social Security benefit payments he received:

| Year | Amount |
|---|---|
| 1995 | $2,230.00 |
| 1996 | $5,484.00 |
| 1997 | $5,640.00 |

13

| 1998 | $5,400.00 |
| --- | --- |
| 1999 | $4,380.00 |
| 2000 | $4,488.00 |
| 2001 | $4,656.00 |
| 2002 | $4,764.00 |
| 2003 | $4,431.00 |
| 2004 | $3,948.00 |
| 2005 | $4,140.00 |
| 2006 | $5,268.00 |
| 2007 | $8,556.00 |
| 2008 | $9,192.00 |
| 2009 | $2,433.00 |
| Total | $75,010.00 |

103. On October 19, 2017, the DEA referred the forfeiture to the United States Attorney's Office – District of Arizona for judicial processing.

104. The undersigned was contacted by Flores' attorney and requested documentation demonstrating how Flores could have sufficient, legitimate income to pay his living expenses and to accumulate the approximate $134,000.00 that had been seized. Flores was unable to provide such documentation.

105. The seized money, including the Defendant Property, could not have come from a legitimate source. Even though Flores appeared to have received a total of $75,010.00 from 1995 to 2009 in Social Security payments, to assume that none of the money was spent in the past eight years (since 2009), let alone the past 22 years (since 1995) appears extremely unlikely, and is unreasonable.

106. Most reasonable people would deposit $75,010.00 cash into a bank account instead of holding it in a safe for more than 20 years. Also, most people, especially those

14

with limited income such as Flores, typically do not acquire such a significant amount of money and not spend it over such a lengthy period of time.

107. The table below shows the seizures connected to Flores, as well as his income since that time:

| Date | Seizure Amount | Income |
| --- | --- | --- |
| 2013 | - | $32,903.00 |
| 2014 | $34,110.00 | $6,607.00 |
| 2015 | - | No Records |
| 2016 | - | No Reported Income Since the First Quarter of 2016 |
| 2017 | $100,200.00* | No Reported Income |
| Totals | $134,310.00 | $39,510.00 |

*This is the total of the two 2017 seizures ($50,200.00 on May 26, 2017 and $50,000.00 on October 17, 2017).

108. Based on the Investigators' training and experience, the Defendant Property (which was part of the $134,310.00 alerted to by trained and certified narcotics canines and found to have several suspicious indicators) was the product of drug trafficking, and not legitimate earnings.

*Summary*

109. The following are some of the factors that demonstrate that the Defendant Property was the proceeds of drug trafficking, that it was involved in drug trafficking, and that it facilitated drug trafficking:

 a. Flores traveling from a drug demand area (Pennsylvania) to a drug source area (Arizona) on May 26, 2017, on a one-way ticket purchased on the date of travel by his girlfriend Ramirez;

 b. The nature in which the Defendant Property was concealed (bundles of cash hidden in the pockets of pants);

15

    c. The primary denomination of the Defendant Property ($20 bills);

    d. Flores having a criminal history involving drugs and violence;

    e. Flores' numerous false statements during the May 26, 2017 incident (according to Flores, he did not have a criminal record, had not had money seized from him in the past, did not have money that had been near illegal drugs, could provide contact information for his mother and the seller of the car, was buying a vehicle for his father (Victor Flores), and his father was alive – all of which later proved to be false);

    f. The alert to the Defendant Property by a trained and certified narcotics canine;

    g. Two similar seizures of currency to that of the May 26, 2017 seizure of the Defendant Property involving Flores ($34,110.00 seized from Flores in 2014 and $50,000.00 seized from his girlfriend, Ramirez, on October 17, 2017, whom Flores was traveling with at the time. In both the October 2014 and October 2017 seizures, the tickets were one-way purchases made within 48 hours of travel, the bundles of currency were alerted to by trained and certified narcotics canines, the flights were coming from drug demand areas to drug source areas, the stories regarding the source and purpose of the currency were suspicious and nonsensical, the currency seized was primarily made up of $20 bills, and the currency was bundled inside of pants); and

    h. Flores' lack of a legitimate source of income.

## FIRST CLAIM FOR RELIEF

110. The Defendant Property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the

Controlled Substances Act, 21 U.S.C. § 801 et seq., and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

111. The Defendant Property is property which was involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 and constitutes or is derived from proceeds traceable to a violation of a specific unlawful activity, including, among other things, 18 U.S.C. § 1952 and 21 U.S.C. § 841, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this

January 26, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*S/Mark J. Wenker*
MARK J. WENKER
Assistant United States Attorney

## VERIFICATION

I, William Neal, verify and declare under penalty of perjury that, I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Complaint for Forfeiture *In Rem* and know the contents, and that the matters contained in the Complaint are true to my own knowledge, except that those matters alleged upon information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I verify and declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of January 2018.

SA *William Neal*
William Neal, Special Agent
Drug Enforcement Administration

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

---

**Plaintiff(s):** United States of America

**Defendant(s):** $50,200.00 in United States Currency

County of Residence: Maricopa

County of Residence: Maricopa

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

Mark J. Wenker , AUSA
40 N. Central Ave. Ste. 1800
Phoenix, Arizona  85004
602 514-7500

Defendant's Atty(s):

---

II. Basis of Jurisdiction:   1. U.S. Government Plaintiff

III. Citizenship of Principal Parties (Diversity Cases Only)

　　　Plaintiff:- N/A
　　　Defendant:- N/A

IV. Origin :   1. Original Proceeding

V. Nature of Suit:   625 Drug Related Seizure of Property 21 USC 881

VI. Cause of Action:   Forfeiture in Rem

VII. Requested in Complaint
　　　Class Action: No
　　　Dollar Demand:
　　　Jury Demand: No

Page 2 of 2

Case 2:18-cv-00280-GMS   Document 1-2   Filed 01/26/18   Page 2 of 2

<u>VIII. This case</u> **is not related** to another case.

**Signature:** <u>s/ Mark J. Wenker</u>

**Date:** <u>01/26/2018</u>

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

**Revised: 01/2014**